____ FILED        ____ LODGED
____ RECEIVED     ____ COPY

AUG 1 1 2008

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ M DEPUTY

**SCHLEIER LAW OFFICES, P.C.**
3101 N. Central Avenue
Suite 1090
Phoenix, Arizona 85012
Telephone:  (602) 277-0157
Facsimile:  (602) 230-9250

TOD F. SCHLEIER, ESQ.  #004612
tod@schleierlaw.com
BRADLEY H. SCHLEIER, ESQ.  #011696
brad@schleierlaw.com
Attorneys for Plaintiff Ronald D. Irwin

**KOHN, KOHN & COLPINTO, LLP**
3233 P Street, N.W.
Washington, DC  20007
Telephone: (202) 342-6980
Facsimile: (202) 342-6984

DAVID K. COLPINTO, ESQ. DC Bar #4166390
dc@kkc.com
*Pro Hac Vice* Attorneys for Plaintiff Ronald D. Irwin

**SEALED**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, RONALD D. IRWIN,<br><br>                    Plaintiff,<br><br>vs.<br><br>SIGNIFICANT EDUCATION, INC., aka GRAND CANYON EDUCATION, INC., a Delaware corporation doing business as GRAND CANYON UNIVERSITY,<br><br>                    Defendant | Case No.: CV07-1771-PHX-DGC<br><br>FIRST AMENDED COMPLAINT FILED **UNDER SEAL** PURSUANT TO 31 U.S.C. §3730(b)(2)<br><br>**JURY TRIAL DEMANDED** |

Plaintiff and Relator Ronald D. Irwin alleges as follows:

## INTRODUCTION

1.      This is a *qui tam* action under 31 U.S.C. § 3729, *et seq.* of the False Claims Act filed by Relator/Plaintiff Ronald D. Irwin, in the name of the United States Government and himself, to recover penalties and damages arising out of false claims approved and presented by Defendant to obtain millions of dollars annually from the United States Department of Education ("DOE") pursuant to the Higher Education Act, Title IV ("HEA"), from at least 2001, continually through the present. Defendant Grand Canyon University ("GCU") is a recipient of HEA federal student financial aid funds from the DOE.  In requesting and receiving millions of dollars annually, Defendant has engaged in a protracted course and pattern of fraudulent conduct to submit false claims for payment to or approval by the United States, by, *inter alia,* falsely representing every year that it is in compliance with HEA's prohibition against using incentive payments for recruiters for recruiting activities, which is a core prerequisite to eligibility for the Title IV funds. Defendant had, and continues to have, actual knowledge that it is not adhering to the HEA ban, that its representations of adherence were and are false, and that it therefore was and is submitting false or fraudulent representations of compliance. Alternatively, Defendant acts and has acted with deliberate indifference and/or reckless disregard as to the truth or falsity of the claims.  Relator asserts causes of action under the False Claims Act for submission of knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1) and (2).

## JURISDICTION AND VENUE

2.     Plaintiff, Ronald D. Irwin, hereby alleges causes of action under 31 U.S.C. §§ 3729, *et. seq.*, of the False Claims Act, arising from Defendant's wrongful conduct and pattern of fraudulent conduct incident to obtaining funds from the DOE pursuant to the Higher Education Act, Title IV.

3.     Plaintiff, Ronald D. Irwin is the original source of all the allegations contained in this Amended Complaint and there has been no public disclosure of the allegations contained in this Amended Complaint.

4.     Pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3729, *et. seq.*, the Plaintiff has provided the government with a confidential disclosure statement and exhibits to substantiate his allegations.

5.     Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3732 and 28 U.S.C. §1331 in that this action arises under the laws of the United States.

6.     Venue and jurisdiction are proper in the United States District Court, Phoenix, Arizona pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732 as the Defendant is an organization and person subject to personal jurisdiction in Phoenix, Arizona and because Defendant maintains and operates its Phoenix campus within this judicial district.

## THE PARTIES INVOLVED

7.     The allegations contained in paragraphs 1 through 6 are hereby re-alleged and set forth fully as above.

8.      Plaintiff, Ronald D. Irwin worked as a National Corporate Liaison for Grand Canyon University until he submitted notice of his resignation on May 9, 2008 and ended his employment on May 14, 2008.  He was previously employed by University of Phoenix as an enrollment counselor.

9.      Defendant, Significant Education, Inc. is a Delaware corporation doing business in the State of Arizona as Grand Canyon University ("GCU").  On or about May 9, 2008, Significant Education, Inc. changed its name to Grand Canyon Education, Inc. GCU was founded as Grand Canyon College, a traditional, private, non-profit college, in 1949 and moved to its existing campus in Phoenix, Arizona in 1951.  In February 2004, several of GCU's current stockholders acquired GCU and converted it to a for-profit institution.   The University offers online and campus-based Bachelor's and Master's degree programs through the Ken Blanchard College of Business, College of Education, College of Nursing and Health Sciences, and The College of Liberal Arts and Sciences. GCU is a participant in federal student aid programs under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 (2000), *et seq.* ("HEA").  GCU is accredited by the Higher Learning Commission and is a member of the North Central Association of Colleges and Schools.  GCU is a regionally accredited provider of online postsecondary education services focused on offering graduate and undergraduate degree programs in the core disciplines of education, business, and healthcare.  In addition, GCU offers programs at its traditional campus in Phoenix, Arizona and onsite at the facilities of employers. GCU has increased enrollment from approximately 3,000 students at the end of 2003 to approximately 14,750 students at the end of 2007, representing a

compound annual growth rate of approximately 49%.  At the end of 2007, 85% of GCU's students were enrolled in online programs and 62% of GCU's students were pursuing master's degrees.

## FACTUAL BACKGROUND

A.   <u>Summary of Fraudulent Conduct and GCU's False Certifications to the Government.</u>

10.   The allegations contained in paragraphs 1 through 9 are hereby re-alleged and set forth fully as above.

11.   Under Title IV of the Higher Education Act of 1965 ("HEA"), Pub. L. No. 89-329, 79 Stat. 1219, Congress established various student loan and grant programs, including the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP").  Although the mechanism by which Title IV funds are disbursed to eligible schools under each of these programs varies, each requires compliance with specific conditions as a prerequisite to obtaining federal funds.  Thus, to become eligible to receive Title IV funds, or to have its students receive funds, under these programs, a school must first enter into a Program Participation Agreement ("PPA") with DOE which "shall condition the initial and continuing eligibility of the school to participate in a program upon compliance with" specific requirements. 20 U.S.C. § 1094(a). See also 34 C.F.R. § 668.14.[1]

---

[1]   To maintain their eligibility to receive Title IV funds, schools must also provide DOE with annual compliance audits and financial statements. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. § 668.23. These audit reports are used to determine whether schools are adhering to applicable funding requirements.

12.     University participation in the Title IV Programs is a multistage process. First, a school must be deemed an "eligible institution." 34 C.F.R. §§ 600.4-600.6 (2005). Once an institution is deemed eligible, it may seek to participate in the student aid programs by requesting and executing the PPA, which sets forth terms and conditions of the program. 34 C.F.R. § 668.14(a)-(b) (2005).   After an institution has executed the PPA, its students may complete an application for various forms of federal student financial assistance.  However, unless and until an individual student applies for such assistance, is determined under distinct Title IV student eligibility regulations as eligible to receive such funds, and then applies such funds to tuition, fees and other educational expenses, no federal funds are paid.

13.     The PPA is a form agreement that has two separate sections which set forth an institution's obligations as a participant in the Title IV Programs: 1) "General Terms and Conditions" and 2) "Certifications Required From Institutions" ("Certifications"). The General Terms and Conditions section contains the following provision:

> The Institution understands and agrees that it is subject to and will comply with the program statutes and implementing regulations for institutional eligibility as set forth in 34 C.F.R. § Part 600 and for each Title IV, HEA Program-in which it participates, as well as the general provisions set forth in Part F and Part G of Title IV of HEA, and the Student Assistance General Provisions Regulations set forth in 34 C.F.R. § Part 668.

14.     Following this agreement of general compliance, the PPA sets forth an itemization of selected DOE regulations, adopted directly from the DOE's "General Provisions Regulations" at 34 C.F.R. § Part 668 ("General Provisions").  Included as one of the General Provisions is a prohibition on incentive-based admissions payments which

states that schools "will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20). Known commonly as the "incentive compensation ban," this statutory mandate is echoed in a regulation specifying the requirements that schools must expressly agree to adhere to in PPAs. *See* 34 C.F.R. § 668.14(b)(22)(i).

15.     Therefore, for an educational institution to be eligible to receive Title IV funds, the federal statutes and regulations require the institution to certify to the United States Government that the institution will comply with the incentive compensation ban through the PPA.  HEA. Sec. 487(a) and (a)(20); 24 C.F.R. §668.14(1)(1) and (b)(22). The PPA expressly states, in bold print, highlighted by a box on the first page that the "execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."  This agreement and certification by GCU is a core prerequisite for its eligibility to request and receive Title IV funds.

16.     An educational institution is ineligible to receive Title IV funds without the PPA certification of compliance with the incentive compensation ban.  Any educational institution that breaches the PPA by violating the incentive compensation ban must return the Title IV funds, along with interest and special costs incurred by DOE.  If GCU is found not to have satisfied the DOE's administrative capability requirements, which

includes compliance with the HEA incentive compensation ban, GCU's students could lose, or be limited in their access to, Title IV program funding.

17.     The restrictions of the incentive compensation ban also extend to any third-party companies that an educational institution contracts with for student recruitment, admissions, or financial aid awarding services.   Since 2005, GCU has engaged Mind Streams, LLC to assist GCU with student recruitment activities and GCU is liable for the conduct of Mind Streams, LLC for any participation in acts that violate the incentive compensation ban.

18.     GCU is currently certified to participate in the Title IV programs through June 30, 2008, but on a provisional basis.   The DOE issued GCU's current PPA in May 2005, after an extended review following the change in control of GCU that occurred in February 2004.   In the May 2005 recertification, the DOE imposed certain conditions on GCU in order to receive Title IV funds and GCU remains certified on a provisional basis. GCU's current provisional certification extends to June 30, 2008, and GCU submitted an application for recertification in March 2008, which remains pending.   If the DOE does not make a decision on GCU's recertification application on or before June 30, 2008, GCU's provisional certification status will be extended on a month-to-month basis. There can be no assurance that the DOE will recertify GCU, or that it will not impose restrictions as a condition of approving GCU's pending recertification application or with respect to any future recertification.

19.     GCU knowingly violates the Title IV ban by, *inter alia,* compensating enrollment counselors, including Relator, based directly upon enrollment activities.   GCU

"stack ranks" counselors based upon their number of enrollments and the top ranking counselors are among the highest paid counselors, receiving the highest salary. GCU Enrollment Managers compile the daily and weekly recruitment activities of enrollment counselors and evaluate each counselor's "success" for that month.

20.   GCU further knowingly violates the Title IV ban by promising and providing incentive trips, lunches, dinners, gift certificates and paid days off based exclusively upon achieving enrollment numbers based upon enrollments and enrollment activities.

21.   Although enrollment counselors receive performance reviews, most of the rating categories are totally subjective and supervisors have little opportunity to observe the job performance of enrollment counselors. GCU maintains "stack rankings" based solely on enrollment activities. GCU's management officials make it clear that enrollments are the key to financial success, determine the amount of money enrollment counselors will earn and that enrollments are the key determining factor in evaluating job performance.

22.   GCU's management officials also make it clear that if enrollment quotas are not met, job termination or other adverse employment action may follow. GCU places enrollment counselors failing to reach acceptable enrollment activity levels on "coaching and counseling" setting forth minimum enrollment activity goals. If an enrollment counselor fails to meet those goals, job termination or other adverse employment action such as decrease in salary may follow. Plaintiff was given a "coaching and counseling" form by his director, Matt Tidwell, which was described to

Plaintiff, by his director, as being only a "Verbal" warning at this point, but could turn into a written and final warning if Plaintiff's enrollments did not improve within the next 30-days. During the same conversation, Plaintiff was also told that unless he achieved 30-35 applications for the month of June 2007, GCU would deny Plaintiff's request to transfer to Phoenix; this transfer request was made so that Plaintiff's wife could receive optimal medical care during her high-risk pregnancy. In addition, as announced by GCU management in postings for promotions, one of the requirements for promotion to certain management positions is achieving certain enrollment numbers.

23.   In order to boost their enrollment numbers, GCU enrollment counselors enroll students without reviewing their transcripts to determine their academic qualifications to attend the university. The pressure to achieve enrollment numbers is so great that Plaintiff is informed and believes, and therefore alleges, that some enrollment counselors have submitted applications containing fictitious names and social security numbers and other(s) have committed forgery on admissions documents, including but not limited to scholarship forms, fee waivers and other memoranda of understanding required for an enrollment number to count for the counselor.

24.   GCU's management officials, including but not limited to Brent Richardson, its Chief Executive Officer, in requesting and receiving tens of millions of dollars a year in Title IV funds, every year falsely certify to the DOE compliance with the incentive compensation ban in the PPA and federal regulations. These false certifications were included in GCU's May 2005 PPA submitted to DOE and in its March 2008 application for recertification. GCU falsely induced the Government to approve and/or

pay out Title IV funds, based on its false promises and certifications to comply with the incentive compensation ban. The promises and certifications when made are false and the Government relied upon the promises and certifications in approving and paying out Title IV funds. Upon making its promises and certifications, GCU knowingly engages in the illegal incentive compensation schemes described herein.

25.    GCU's management officials every year also falsely assert compliance with the incentive compensation ban in "management assertion letters" written by GCU management for an annual compliance audit. GCU must submit to the United States Government this annual compliance audit performed by an independent certified public accountant. Participation in the Title IV program is conditioned upon GCU submitting these audits certifying compliance with the HEA incentive compensation ban. GCU is ineligible to submit any claims for HEA funds unless it submits this annual audit.

26.    As part of the audit, GCU annually certifies in a management assertion letter that it has "not paid to any persons or entities any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments... for each year at issue." GCU knows this certification is false because GCU intentionally violates the incentive compensation ban. The Government relied upon GCU's false certifications in approving and paying out Title IV funds to Defendant. Upon making its promises and certifications, GCU knowingly engages in the illegal incentive compensation schemes described herein and GCU has engaged in a protracted course and pattern of fraudulent conduct to carry out this scheme to falsely obtain approval for payment and payments from the United States.

27.   GCU deliberately conceals from DOE its continual and ongoing practices that intentionally violate the HEA incentive compensation ban as part of GCU's protracted fraudulent conduct to falsely obtain Title IV funds from the DOE.

B.   GCU's Claims For Federal Government Funds.

28.   The allegations contained in paragraphs 1 through 27 are hereby re-alleged and set forth fully as above.

29.   Upon entering the PPA agreement with the United States Secretary of Education, GCU is eligible to request the Title IV funds from the United States (for Pell Grant funds) or from third party lenders (for government insured loans).

30.   For Pell Grant funds, GCU submits a request for those funds directly to the Secretary of the United States Department of Education.  The request for funds is not a student application but a request prepared and transmitted by GCU to the DOE stating the requested amount of funds.  The DOE transfers the Pell Grant funds electronically into a GCU account.  Upon receiving the Pell Grant funds, GCU credits various GCU students for tuition paid.  A GCU student does not directly request or receive any of the Pell Grant funds, rather those funds are requested and received by GCU only after, and as a condition of, certifying compliance with the incentive compensation ban.

31.   GCU's claims for Pell Grant funds are fraudulent.  When GCU requests, receives and retains the Pell Grant funds, GCU knows it is ineligible to receive those funds because of its intentional violations of the HEA incentive compensation ban.  GCU knows that compliance with the HEA funding statute incentive compensation ban is a core prerequisite to request and receive Title IV funds.

32.   For government insured loans, including but not limited to the FFELP, GCU submits the request for those funds directly to a private lender.  GCU's request for government-insured loan funds arranged, managed and prepared by GCU, includes a student application that contains an express certification by GCU that the student is an eligible student under the Title IV program.  The claim for government-insured loans must include this certification by GCU.  However, GCU knows that this claim for funds is false when made because GCU knows its students are not eligible under the Title IV program due to GCU's violations of the HEA incentive compensation ban.  GCU's fraudulent violations of the HEA incentive compensation ban make it ineligible under the Title IV program.  The lender, typically a bank, transfers the government-insured loan funds directly into a GCU account.  Upon receiving the government-insured loan funds, GCU credits various GCU students for tuition paid.

33.   GCU's claims for government insured loan funds are fraudulent.  When GCU requests, receives and retains the government insured loan funds, GCU knows it is ineligible for those funds because of its intentional violations of the HEA incentive compensation ban.  GCU knows that compliance with the HEA funding statute incentive compensation ban is a core prerequisite for its eligibility to request and receive Title IV funds.

34.   The United States government pays all interest on the government insured loans while the students are enrolled in classes and during authorized grace periods.  The loans are guaranteed by state agencies or non-profit organizations (called "guarantee agencies"), and are subsidized and reinsured by the U.S. Department of Education.  If a

student defaults on the government insured loan, the guarantee agency reimburses the lender, and if the guarantee agency cannot collect from the student, the DOE reimburses the agency for the full amount of the defaulted loan.

35.     The DOE monitors loan defaults of post-secondary schools and calculates a "cohort default rate" every year for GCU. The DOE calculates the loss to the United States government relying upon this rate.

C.     <u>GCU Knowingly Violates the Incentive Compensation Ban</u>.

36.     The allegations contained in paragraphs 1 through 35 are hereby re-alleged and set forth fully as above.

37.     Plaintiff was hired on February 13, 2006 with the job title of Enrollment Counselor only to be promoted a short time later to the job title of National Corporate Liaison. GCU recruited him away from the University of Phoenix with the promise of much better money and the promise that it was a "Christian" institution that places great value on ethical and moral business practices.

38.     Within two months of service to GCU, Plaintiff was quickly promoted from a phone bank enrollment counselor to National Corporate Liaison (a field enrollment counselor). He was assigned the eastern half of the United States, basically from the Mississippi River to the Atlantic – from Canada to Cuba. Every week GCU would fly him east to give presentations and to enroll students and collect leads that could be solicited by the phone bank personnel.

39.     Plaintiff averaged 12-15 applications for enrollment at GCU a month, with good months reaching into obtaining 20 or more applications. His initial annual salary

was $38,000.  Within one month, it was raised in March 2006 to $45,000 and to $57,500 in July 2006, all based upon his job performance.  The July 2006 salary increase was due to the significant number of enrollments (53) Plaintiff obtained in June 2006.

40.    Plaintiff approached his division director, Matt Tidwell, with a proposal for eliminating the traveling representatives, in exchange for the cost saving benefits of hiring territory representatives who resided in their territories.  He was offered any territory he wanted in the country (except Tennessee and New York) once the idea was given executive approval.  He chose Oregon and Washington, with his prime markets being Portland and Seattle.  He was the only counselor in his division to receive any substantive moving assistance and was told by his supervisor not to discuss the details of the relocation package with his co-workers, as it was only approved "due to your numbers."

41.    On or about May 15, 2006, GCU's executive team attended an Operations/Communications Meeting which included Brent Richardson, Chief Executive Officer, Tim Fischer, Chief Financial Officer, John Crowley, Chief Operations Officer and Executive Vice President, Joyce Hatch, Director of Financial Aid and several enrollment directors.  During that meeting, Karilyn Van Ossten, Director of Ground Enrollment at GCU, told the executive team:  "Targeting College of Education.  Have enrolled 254 in Professional Studies against a target of 500 and 260 high schoolers against a goal of 800.  Contests among the enrollment counselors are being held in an effort to meet targets." Throughout the course of Defendant's pattern of fraudulent conduct, the Defendant has held numerous contests and provided other incentive

1   compensation to enrollment counselors in order to boost enrollment, all in violation of the

2   incentive compensation ban, and that practice has been ongoing, through and continuing

3   after Plaintiff's resignation.

4        42.    GCU's executive team, including but not limited to, Brent Richardson, Tim

5   Fischer, John Crowley, Joyce Hatch and enrollment directors had, and continue to have

6   as set forth below, actual knowledge that GCU was not adhering to the HEA ban on

7   paying enrollment counselors incentives, bonuses, or commissions for enrollment

8   activities, that GCU's representations and certifications of adherence were and are false,

9   and that it therefore was and is submitting false or fraudulent representations and

10  certifications of compliance with the HEA ban.  Alternatively, Brent Richardson, Tim

11  Fischer, John Crowley, Joyce Hatch and enrollment directors act and have acted with

12  deliberate indifference and/or reckless disregard as to the truth or falsity of the claims.

13  Defendant has engaged in numerous wrongful acts as part of an ongoing protracted

14  course or pattern of fraudulent conduct in order to obtain false payment or approval of

15  payments by the United States.  By way of partial example, on May 24, 2007, Matthew

16  Tidwell, Director of Business Development and Enrollment wrote to enrollment

17  counselors as follows:

18  **From:** Matt Tidwell
    **Sent:** Thursday, May 24, 2007 12:02 PM
19  **To:** Britt Chandler; Chaz Smith; Heather Banks; Ian Carpenito; Josh Thompson;
    Nicholas Poptanycz; Priscilla Insco; Andrea Landerman; Barry Yaroch; Diedre
20  Robinson; Dwight Boswell; Joe Rossberger; Michelle Webster; Peg Mulloy; Renee
    Wright; Robert Shaw; Ronald Irwin
21  **Cc:** Jacob Mayhew; Tares Figueroa
    **Subject:** Reward!!

-16-

Any team to hit 25 new student applications completed and put into LMS and SAS will receive a $25 gift card to your restaurant of choice!! Make sure they are legit!!! □

Matthew G. Tidwell

Director of Business Development and Enrollment

43.     In January 2007, during a telephone call, Plaintiff asked for his bi-annual performance review from Britt Chandler, Enrollment Manager for the Department of Business.  Mr. Chandler told Plaintiff that he did not want to give him his review at that time because he did not have enough enrollments to get a raise.  Mr. Chandler stated that John Crowley, Chief Operating Officer and Matt Tidwell Co-Director of Online Business Enrollment would never approve a raise based upon Plaintiff's enrollment numbers. Plaintiff argued about all he had achieved, the scores of applications he had obtained that were never processed and was told, sorry if "we don't get paid, you don't get paid."

44.     Subsequently, in late May-early June 2007, Plaintiff's supervisor, Jacob Mayhew, provided him with a performance review.  During that review, Plaintiff was told how he was a "stellar rep with a positive attitude, an incredible work ethic and great concern for the success of the institution."  He was told that in all areas of his presentation, personal appearance, skills, attitude, time management, territory management and work with student issues, Plaintiff received scores of 8, 9 or 10 by Plaintiff's review director, Matt Tidwell.

45.     However, Mr. Mayhew told Plaintiff that because inside sales people did not timely process applications, Plaintiff would not receive a raise.  Plaintiff was told that his enrollment numbers simply did not meet the quotas set.  Mr. Irwin reminded Mr.

Mayhew that quota or pay raises or subtractions based on enrollment numbers alone were illegal.  Mr. Mayhew was formerly employed by the University of Phoenix as a Senior Manager; Mr. Irwin reminded Mr. Mayhew that the "kind of games" being played by GCU were exactly the "kind of games" that resulted in the University of Phoenix being sued.  Mr. Mayhew did not respond, except to state that "enrollment performance had to be there."

46.     Mr. Mayhew stated that based on the weight given to the enrollment numbers, Plaintiff would have taken a nearly $5,000 a year pay cut, but due to his value to the school, they had decided to award him 9.1 out of 10 bonus points as an adjustment, based upon attendance, work ethics, proper use of paid time off, integrity, team and self-leadership qualities.  Mr. Mayhew stated that the adjustment is what saved Plaintiff from taking a pay decrease due to his enrollment numbers.  However, Plaintiff knew that his supervisors rarely took the opportunity to observe these subjective evaluation areas both while Plaintiff's job performance took place out of state, as well as when his job duties took place at the Phoenix Campus. Nearly half the out of state field visits made by managers were requested by the Plaintiff and all management visits lasted less than a day, most times with managers and directors spending less than a couple hours actually observing Plaintiff's work practices. During Plaintiff's tenure working on the GCU campus where management and directors saw the Plaintiff everyday, no one in management ever spent time observing Plaintiff's work habits or interactions with the students he was enrolling.

47.     During his employment, Plaintiff became aware that GCU provided incentives to enrollment counselors based upon the number of applications/enrollments they secured.  On May 23, 2007, Matt Tidwell, Director of Business Development and Enrollment, sent an email to the enrollment counselors that set forth minimum monthly requirements for the counselors to achieve, including obtaining 35 completed applications per month.

48.     In an announcement of incentives for applications/enrollments, enrollment counselors also were provided with a document entitled "Team Business 2007 Monthly Goals."   The document describes **"Monthly Rewards"** as follows:

    Director's Club
    20+ Enrollments
    EC will earn **1 day off** to be used in the next month.
    EC's picture will be put on the Director's Club Wall.
    Members of the Director's Club will be taken out on a
    group lunch by the Director.
    Manager's Club
    15-20 Enrollments
    EC will earn a **½ day** to be used in the next month.
    EC's picture will be put on the Director's Club Wall.

49.     Consequently, enrollment counselors are provided incentives in the form of paid days off for reaching enrollment quotas, a practice which has continued through and including the date of Plaintiff's final date of employment on May 14, 2008.

50.     Plaintiff has also learned that many enrollment counselors would be given August 31, the beginning of Labor Day weekend, off, with pay, and without having to use PTO time if, as a team, they obtained 203 enrollments for the month.  One manager allowed Fridays to be taken off with pay for an entire following month, plus the

remainder of the current month, once an enrollment counselor on that team achieved 15 enrollments. Plaintiff also learned that another enrollment manager provided incentives to his enrollment counselors by giving his team off each Friday they achieve three or more enrollments in that week. Furthermore, Plaintiff has learned that the incentive days are encouraged and supported all the way up the management chain of command and that in managers' meetings different creative programs to offer these free days off and other prizes for enrollment numbers are discussed.

51.     During a weekly conference call, Mr. Tidwell was discussing applications with the enrollment counselors. He stated that there were two reasons the counselors must get better at getting the applications: First to help the student fulfill their dreams...Second was to "help our own personal income"...he stated, "getting the application is the only way you will hit your goal and hitting that enrollment goal is the only way you will increase your personal income."

52.     On July 16, 2007, Plaintiff's supervisor, Jacob Mayhew sent an email which clearly tied good performance reviews (and presumably salary raises) to enrollments. On that same day, Mr. Mayhew sent another email that stated: "Remember, the more events you have the more opportunities you have to enroll which equals a bigger check for each of you."

53.     Chief Operating Officer John Crowley has told Plaintiff directly: if you don't get the number of enrollments we tell you to get, I don't care how great you are at doing other things for the school you will be fired...this job is about bringing money into the school period.

54.     Every year GCU takes its marketing representatives, enrollment counselors, field reps and managers on an annual ski retreat to Lake Tahoe.  This is not a meeting, or training for the enrollment counselors, but a vacation.  Mr. Crowley stated during the awards dinner in March 2007 that next year's retreat would be limited to those from each team that produced the most enrollments.  Mr. Crowley stated: "We have grown so much that I am announcing tonight, next year's Tahoe retreat will not be for everyone.  It will be to recognize the top performers, if you want to be one of them, you know what you need to do."

55.     At a retreat in August 2007 held at The Boulders, Mr. Crowley expanded on the Tahoe trip announcing the establishment of "The President's Club," and that it would be the members of the President's Club that would be going to Lake Tahoe.  He then said that more details on the Lake Tahoe trip and President's Club would be released in the fourth quarter when the school would be looking for "a big sales push."  On August 15, 2007, management indicated that being in the Top 25 highest enrolling representatives was a "good place to be" relative to the Lake Tahoe retreat.

56.     In February 2007, Plaintiff learned that his wife was pregnant.  In June 2007, they learned that their baby's kidney was abnormal.  This condition would require close monitoring during the pregnancy, the need for delivery in a more specialized medical facility, and possible extensive medical follow-up post-partum.

57.     On June 13, 2007, Mr. Irwin submitted a request pursuant to the Family Medical Leave Act for family medical leave for purposes of taking his wife to doctors' appointments and attend, when necessary.  In light of his wife's family residing in

Phoenix and the presence of Phoenix Children's Hospital and the Mayo Clinic, he requested a transfer to Phoenix, where GCU's main campus is located.

58.     On June 18, 2007, Plaintiff's supervisor issued a "verbal" Employee Coaching & Counseling Statement form.   He was told that he would be required to achieve 30-35 quality applications per month and that if he did not hit that number in thirty days, the coaching and counseling would be a written warning and Plaintiff could be fired.  During that session, Plaintiff was told directly that no transfer back to Arizona would be approved if he did not obtain 30-35 applications that month.

59.     Throughout the fall of 2007 and continuing into 2008, Jacob Mayhew, Director of Business Enrollment, and the managers below him, announced and conducted contests which rewarded enrollment counselors with the day off on Christmas Eve day, having Fridays as a day or half-day off with pay, catered lunches and trips to the movies, chair massages and monetary gift cards solely for enrollments brought in by enrollment counselors.  These contests were announced through e-mail notifications and the results of these contests were distributed to enrollment counselors through "stack rankings" demonstrating the number of enrollments each counselor or team of counselors achieved.

60.     On or about January 7, 2008, Joyce Hatch, Director of Financial Aid, announced at an Operations Meeting that GCU posted $162,000,000 in financial aid funds during 2007.   Plaintiff is informed and therefore believes that a significant percentage of those financial aid funds were Title IV funds.   On March 10, 2008, Financial Aid Manager David Weems announced at an Operations meeting that GCU had brought in $76,000,000 in student loans in 2008.

61.    On or about April 30, 2008, John Crowley, COO, announced the formation of the "Achiever's Club" in a flyer distributed to all enrollment managers which would reward the top enrollment counselors from each enrollment division based solely on enrollment numbers.   The three enrollment counselors with the highest monthly enrollments would be rewarded with a monthly luncheon with John Crowley and outside top performers will be taken to dinner by John Crowley at the annual Summer Retreat.

62.    On or about May 13, 2008, a new series of incentive-based competitions were formulated by GCU.  GCU managers met with Director Mayhew to develop a new incentive competition that could be implemented division-wide.   Each Team in the division would be broken into 3 mini-teams (comprised of 4-5 people per team).   Each day one mini-team from one team would be matched up against a mini-team from another team.  Each mini-team would be awarded one point for every referral it received in that day and 3 points for each enrollment.  The mini-team with the most points at the end of each day would move into the next bracket, while the losing mini-team would be eliminated.  The full team that has the most points would be taken to a movie paid for by GCU during regular work hours and the winning mini-team would be treated to good seats to watch an Arizona Diamondbacks game at Chase Field during regular business hours.  Furthermore a power point slide show projected on the wall at the front of the Enrollment Center Annex continually updates the standings in this competition to drive the teams and individuals into a competitive state of mind while performing their duties.

63.     On May 13, 2008, Priscilla Insco, Plaintiff's supervisor, also announced the continuation of Half-Day Fridays with pay for any enrollment counselor reaching their enrollment goal each month and offered half-day Fridays with pay for any enrollment counselor securing 6 enrollments each week.  If the team hit 80 enrollments by the end of the week Ms. Insco would take all of her enrollment counselors out for an extended pizza lunch.

**COUNT ONE**
**(Knowingly Making False Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. §3729(a)(1))**

64.     The allegations contained in paragraphs 1 through 63 are hereby re-alleged and set forth fully as above.

65.     In performing all of the acts described herein, Defendant has defrauded the United States of America by knowingly, willfully or recklessly presenting, or causing to be presented, to one or more officers, employees or agents of the United States of America, a false and fraudulent claim for payment or approval, in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay. In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to Defendant's submission of false claims for payment to the United States.

66.     As a direct and proximate result of Defendant's fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly

thousands of false claims and spent tens of millions of dollars pursuant to the Title IV program.

67.     Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

68.     Each and every such fraudulent claim would be subject to a civil fine under the False Claims Act of five to ten thousand dollars ($5,000 – $10,000).

## COUNT TWO
**(Knowingly Submitting False Records or Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. §3729(a)(2))**

69.     The allegations contained in paragraphs 1 through 68 are hereby re-alleged and set forth fully as above.

70.     In performing all of the acts described herein, Defendant has knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act, 31 U.S.C. §3729(a)(2), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay. In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to Defendant obtaining payments from the United States.

71.     As a direct and proximate result of Defendant's fraudulent and/or illegal actions, the United States has paid directly or indirectly thousands of false claims and spent tens of millions of dollars pursuant to the Title IV program.

72.     Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

73.     Each and every such fraudulent claim would be subject to a civil fine under the False Claims Act of five to ten thousand dollars ($5,000 – $10,000)

WHEREFORE, Plaintiff demands judgment for all of the following:

1.     That this Court enter a judgment against Defendant in favor of the United States of America in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000.00), and not more than Ten Thousand Dollars ($10,000), for each violation, pursuant to 31 U.S.C. §3729(a);

2.     That Relator/Plaintiff be awarded all reasonable attorneys fees and costs, pursuant to 31 U.S.C. § 3730 subsection (d) (1) (b);

3.     That in the event the United States Government continues to proceed with this action, the Relator/Plaintiff be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of any award or the settlement of the claims;

4.     That in the event that the United States Government does not proceed with this action, the Relator/Plaintiff be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of any award or settlement;

5.     That the Relator/Plaintiff be awarded pre-judgment and post judgment interest;

6.      That the United States Government and the Relator/Plaintiff receive all relief both at law and at equity, to which they may reasonably appear to be entitled.

### JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

Dated this 11th day of August, 2008.

SCHLEIER LAW OFFICES, P.C.

Tod F. Schleier

KOHN, KOHN & COLAPINTO, LLP

David K. Colapinto
Attorneys for *QUI TAM* Plaintiff Ronald D. Irwin